[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-14446

_____

D.C. Docket No. 1:19-cr-00077-LMM-RGV-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

FREDRICO PACHECO-ROMERO,

Defendant,

JEROME D. LEE,
STEPHEN ELIJAH BROWN-BENNETT,
TAYLOR, LEE & ASSOCIATES,

Interested Parties-Appellants.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(April 28, 2021)

Before WILLIAM PRYOR, Chief Judge, JILL PRYOR, Circuit Judge, and SELF,[*] District Judge.

JILL PRYOR, Circuit Judge:

Attorneys Jerome Lee and Stephen Elijah Brown-Bennett of the law firm Taylor, Lee & Associates were retained to represent six defendants who were charged in federal district court with conspiring to possess with intent to distribute methamphetamine. Shortly after the defendants were arraigned, the district court disqualified the attorneys and the law firm from representing any of the defendants based upon an actual or potential conflict of interest.

Before the district court entered the disqualification order, the law firm had collected a total of $21,000 from the defendants. Because the attorneys and the law firm were disqualified so early in the case, questions arose about whether the law firm had earned the entire fee it collected and, if it had not, whether the portion of the fee that did not belong to the law firm should be refunded to the defendants or used to reimburse the fees and expenses of the defendants' appointed

_____

[*] Honorable Tilman Eugene Self III, United States District Judge for the Middle District of Georgia, sitting by designation.

2

replacement counsel pursuant to the Criminal Justice Act ("CJA"), 18 U.S.C. § 3006A(f). The attorneys refused to comply with court orders directing them to turn over information the court needed to determine what portion of the fee, if any, the law firm had not earned. Because of their non-compliance, the district court ordered the law firm to pay $15,000 of the $21,000 fee into the court's registry. Eventually, the law firm paid the money into the court's registry and the attorneys provided the requested information. The court then determined that $8,000 of the funds in the registry had been earned by and thus belonged to the law firm. Exercising its authority under the CJA, the court directed that the remaining $7,000 be paid to the CJA fund as reimbursement for the fees and expenses incurred by defendants' counsel who were appointed by the court after the disqualification.

In this appeal, appellants Lee, Bennett, and the law firm challenge the district court orders requiring the firm to pay $15,000 into the court's registry and directing that $7,000 of those funds be paid to the CJA fund to cover the fees and expenses of the defendants' court-appointed counsel. After careful consideration and with the benefit of oral argument, we affirm in part and dismiss in part.

## I.    FACTUAL BACKGROUND

In the underlying criminal case, six individuals were charged in the United States District Court for the Northern District of Georgia with conspiring to possess with intent to distribute methamphetamine. After their arrests, all six

defendants retained the law firm of Taylor, Lee & Associates to represent them. The attorneys who represented the defendants were Lee, one of the firm's named partners, and Bennett, an associate of the firm. Under the terms of their engagement letters with the firm, each defendant agreed to pay a flat fee of $7,500 for representation throughout his criminal case. The flat fee was to be paid by each defendant as follows: $3,500 up front and the remaining $4,000 in monthly installment payments.

As it turns out, Lee and Bennett represented the defendants only briefly. They appeared as counsel for most of the defendants at their initial appearances and for all the defendants at their detention hearings and arraignments. Each defendant purported to waive any conflict of interest arising from the joint representation. But the magistrate judge, who was presiding over proceedings related to disqualification,[1] expressed concern about the conflict-of-interest issues that might arise from joint representation in a drug conspiracy case. *See* Fed. R. Crim. P. 44(c)(2); *United States v. Wheat*, 486 U.S. 153, 163–64 (1988) (discussing conflict-of-interest issues that may arise when an attorney "propose[s] to defend [multiple] conspirators of varying stature in a complex drug distribution scheme").

---

[1] *See* Fed. R. Crim. P. 59(a) (permitting a district court judge to "refer to a magistrate judge for determination any matter that does not dispose of a charge or defense").

On March 14, 2019, the magistrate judge held a hearing on disqualification. At the hearing, each defendant indicated that he wanted to continue with the joint representation. The magistrate judge raised the question of whether the law firm was being paid by the defendants or some other third party. Each defendant stated that he, or his family, had paid the law firm. And Lee indicated that the firm could provide records confirming that the payments to the firm came from each defendant or his family, not a third party.

After the hearing, the magistrate judge disqualified the appellants from representing any of the defendants. Noting the government's allegations that the defendants had played differing roles in the drug-distribution organization, the magistrate judge found that joint representation by a single law firm of the six defendants charged in the conspiracy gave rise to "serious potential, if not actual, conflict of interest" issues. Doc. 76 at 4.[2] After disqualifying the appellants, the magistrate judge determined that each defendant was financially unable to obtain counsel and appointed counsel for each one pursuant to the CJA.[3] *See* 18 U.S.C. § 3006A(c).

---

[2] "Doc." numbers refer to the district court's docket entries.

[3] Although some defendants replaced their appointed counsel with retained counsel, each defendant was represented by court-appointed counsel for at least some portion of his criminal case.

After the disqualification, the magistrate judge raised the issue of whether, given the limited course of the representation, the law firm was entitled to keep its entire fee.[4]  At a hearing on March 26, the magistrate judge explained that the law firm was entitled to keep at least a portion of the fee, for work that was performed before disqualification, but that it would owe a partial refund if the total amount collected from the defendants exceeded the fee that was earned prior to disqualification.  Because the law firm had received at least one payment from each defendant, the magistrate judge explained, it appeared that the firm had collected at least $21,000.[5]  In order to determine whether the defendants were entitled to a refund, the magistrate judge ordered Lee and Bennett, by March 29, to provide the court with an accounting showing the fees each defendant paid to the law firm and the services provided to each defendant.  Lee and Bennett agreed to provide the information by the deadline.

---

[4] Georgia law permits an attorney to charge a client a flat fee for representation in a criminal case.  *See Fogarty v. State*, 513 S.E.2d 493, 497 (Ga. 1999).  The attorney may not be entitled to keep the entire flat fee, however, if the representation is terminated before the case ends.  *See In re Polk*, 814 S.E.2d 327, 328–29 (Ga. 2018); *see also Nash v. Studdard*, 670 S.E.2d 508, 514 (Ga. Ct. App. 2008) (recognizing that an attorney who had charged a client a flat fee for representation in a criminal case had an obligation to return any "unearned portion" of the flat fee when the representation was terminated while the criminal case remained pending).

[5] By this point, the magistrate judge had received copies of the defendants' engagement letters with the law firm.  Under the terms of the engagement letters, signed on February 9 and February 11, the defendants agreed to make monthly installment payments on the 9th or 11th of the month.  Because the appellants were disqualified on March 22, it was unclear to the magistrate judge whether the law firm had received any monthly installment payments from the defendants.

By the deadline, the only information the attorneys provided to the court was an affidavit from a family member of each defendant. Each affiant described his or her relationship to the defendant and then stated that money paid to the law firm came from the affiant's "personal funds." *See, e.g.*, Doc. 83 at 2. The affidavits did not disclose when any such payment was made, the number of payments made, or the amount paid.

Although the court also had directed the attorneys to provide information showing the total amount the defendants had paid to the law firm and identifying the services the firm had provided to the defendants, the attorneys did not provide this information, sought no extension of time to provide this information, and offered no explanation for failing to provide this information.

On April 24, nearly a month after the accounting information was due, the magistrate judge entered an interim order addressing the status of the fees the defendants had paid to the law firm. The order noted that the court had "afforded counsel the opportunity to submit an accounting" to address the firm's entitlement to the fees, yet they had failed to provide information showing how much the law firm had collected from each defendant or the services it had provided. Doc. 107 at 1.

The magistrate judge proceeded to make interim findings related to the law firm's fee. The magistrate judge began with an understanding that the law firm

7

had collected a total of at least $21,000 in initial payments from the defendants. Based on the record showing that Lee and Bennett had represented the defendants at their initial appearances, arraignments, and detention hearings, the magistrate judge estimated that the law firm had earned $6,000 as reasonable compensation for these services.

In light of his estimates that the firm had collected $21,000 from the defendants but earned a fee of only about $6,000, the magistrate judge directed the attorneys and the law firm, by April 30, to deposit the remaining $15,000 in fees the law firm had collected from the defendants into the court's registry. The magistrate judge said that the funds would be held in the registry pending further proceedings inquiring into whether they belonged to the firm or should be refunded to the defendants or "applied to the CJA fund." *Id.* at 1–2.

The appellants did not comply with this order. They first sought a one-week extension of the deadline to pay into the court's registry, saying the firm needed additional time to come up with $15,000. The magistrate judge extended the deadline to May 6. On May 6, though, the appellants still had not paid any money into the registry, requested another extension of time, or explained their inability to comply with the extended deadline.

The magistrate judge then ordered the attorneys to appear at a show-cause hearing, and also address in writing, why sanctions should not be imposed. The

8

appellants filed with the district court objections to the magistrate judge's order. In their objections, they asserted that the magistrate judge had no authority to order the law firm to pay money into the court's registry. They complained that the magistrate judge had failed to afford them due process, arguing that before entering the order requiring payment into the registry, the magistrate judge supposedly had given them no opportunity to be heard on "what work had been done or exactly how much the Defendants had paid to" the law firm. Doc. 125 at 5.

At the show-cause hearing on May 9, Lee represented that the law firm had not paid into the court's registry because it did not have $15,000 in its bank account. He also complained that it was not "fair" or "reasonable" for the court to inquire whether the law firm had earned the fees the defendants had paid it. Doc. 227 at 15.

On May 17, the district court overruled the objections. The district court ruled that the magistrate judge had the authority to order the appellants to pay a portion of the fees the law firm had received into the court's registry. The court found that each defendant had paid a "substantial retainer[] prior to disqualification for services that would never be rendered." Doc. 142 at 4. And because each defendant, for at least a portion of the case, had been represented by court-appointed counsel, the court found that the CJA "empowered" the magistrate judge

9

to recover money belonging to the defendants to offset the fees and expenses of their appointed counsel. *Id.* (citing 18 U.S.C. § 3006A(f)).

The district court also rejected the argument that the magistrate judge had failed to afford due process before directing the appellants to pay the funds into the court's registry. The district court observed that the magistrate judge had "issued several orders, granted extensions of time, and held several hearings" to give the appellants an "opportunity to provide an accounting." *Id.* at 5. By doing so, the district court explained, the magistrate judge had given them an opportunity to be heard on what portion of the fees the law firm had earned before the disqualification. "[H]aving not provided an accounting despite numerous orders and hearings on this issue," the court said, the appellants "cannot no[w] complain" that the magistrate judge "overestimated the proper . . . amount" to be paid into the registry. *Id.* at 6. And, the court noted, the inquiry into the total fees the law firm had earned was not complete. The money would be held essentially in "escrow" in the court's registry so the appellants "could still . . . provide billing evidence" to establish how much the law firm had earned and potentially be entitled to the return of some or all of the deposited money. *Id.*

Even after the district court entered this order, the appellants did not pay any funds into the court's registry or provide an accounting. On May 20, the magistrate judge entered an order certifying facts for the district court to consider

10

in contempt proceedings against the appellants.  *See* 28 U.S.C. § 636(e)(6) (setting forth procedures for magistrate judge to certify to district court facts related to contempt proceedings).  The district court then ordered the appellants to appear at a contempt hearing, instructing that they could avoid being held in contempt by depositing $15,000 into the court's registry and providing an accounting.

It was only at the contempt hearing on June 19 that the appellants finally agreed to deposit the $15,000 and to submit an accounting.  Immediately after the hearing, Lee paid $15,000 into the court's registry, but the promised accounting information was not supplied.

Afterward, the district judge entered an order notifying the appellants of her intention to hold them in contempt and order them to pay $500 per day until they provided an accounting.  Before holding them in contempt, however, the court gave the appellants "one more opportunity to provide the accounting."  Doc. 170 at 9.  Because the appellants then submitted time records detailing the services they had performed on the defendants' behalf, the court did not hold them in contempt.

The district court referred the issue of how the money in the court's registry should be distributed to the magistrate judge.  Noting that the appellants still had not verified the total fees the law firm had collected from the defendants, the magistrate judge entered another order directing the appellants to provide documentation verifying the amount of fees the defendants had paid to the law

11

firm. About a month later—now nearly five months after the magistrate judge had first ordered the appellants to provide this information—Lee submitted an affidavit stating that the firm had received only an initial payment from each defendant and had no receipts or bank records related to the payments.

The magistrate judge held a hearing where the appellants had yet another opportunity to be heard on the total amount of fees the law firm had earned. At the hearing, Lee and Bennett admitted that they had not kept contemporaneous time records reflecting the time they spent working on the case. They relied on their recollections of how much time they spent working on the case to create the time records that they filed with the court.

After the hearing, the magistrate judge issued an order addressing the distribution of funds in the court's registry. The judge found that the law firm had collected total fees of $21,000 from the defendants. Based on the scope of the legal services Lee and Bennett provided before their disqualification and their hourly rates,[6] the magistrate judge found that the appellants had earned total fees of $14,000. Accounting for the $6,000 the law firm had been permitted to keep, the magistrate judge directed the clerk of court to pay the firm $8,000, plus accrued interest, from the funds held in the court's registry. After finding that the

---

[6] The magistrate judge reduced Lee's in-court hourly rate from $500 per hour to $400 per hour and Bennett's in-court hourly rate from $350 per hour to $300 per hour.

remaining $7,000 in the registry constituted funds "available" to the defendants for CJA purposes, 18 U.S.C. § 3006A(f), the magistrate judge directed the clerk to pay this amount to the CJA fund "to defray the expense associated with appointing counsel" for the defendants. Doc. 195 at 6.

The appellants objected to the magistrate judge's order. After the district court overruled their objections and directed compliance with the magistrate judge's order, they filed this appeal.[7]

## II.    LEGAL ANALYSIS

Under the CJA, district courts must furnish legal counsel to criminal defendants who are "financially unable to obtain counsel." 18 U.S.C. § 3006A(b). The CJA addresses the compensation of appointed attorneys. *Id.* § 3006A(d)(1).

If at any time after the appointment of counsel the court finds that a defendant "is financially able to obtain counsel or to make partial payment," the court "may terminate the appointment of counsel or authorize payment as provided in subsection (f), as the interests of justice may dictate." *Id.* § 3006A(c). When a court finds that "funds are available for payment from or on behalf of a person furnished representation," the court may direct that the money be paid "to the

---

[7] On appeal, the United States did not submit a brief or appear at oral argument. In a letter to the court, the government explained that it chose not to participate in the appeal because it had not been involved in the "hearing or . . . litigation in the district court concerning [the] fee" and did "not have a stake" in the outcome. Jan. 22, 2021 Letter at 2.

appointed attorney, to the bar association or legal aid agency or community defender organization which provided the appointed attorney, . . . or to the court for deposit in the Treasury as a reimbursement." *Id.* § 3006A(f).[8]

On appeal, the appellants challenge on four grounds the district court's orders entered pursuant to § 3006A(f). We begin by examining our appellate jurisdiction to review each ground. We then address the merits of those challenges over which we have appellate jurisdiction.

### A.

Federal law grants the courts of appeals "jurisdiction" to review "final decisions" of the district courts. 28 U.S.C. § 1291. This provision confers "jurisdiction to review decisions made by a district court in a *judicial* capacity." *Ayestas v. Davis*, 138 S. Ct. 1080, 1089 (2018) (emphasis in original). But "not all

---

[8] The appellants argue that once a district court determines a defendant is financially unable to obtain counsel, the court may not make a finding under the CJA that funds are available to the defendant. They misunderstand the CJA. As we explain above, the CJA expressly permits a district court, after finding that a defendant is financially unable to obtain counsel and appointing counsel, to determine later that funds are available to the defendant and direct that those funds be paid to the Treasury as reimbursement for compensation paid to appointed counsel. 18 U.S.C. § 3006A(c), (f).

To support their interpretation, the appellants cite to our predecessor court's decision in *United States v. Jimenez*, 600 F.2d 1172 (5th Cir. 1979). Even though *Jimenez* constitutes binding precedent, *see Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), it does not change our analysis. Nothing in *Jimenez* prohibits a district court, after determining that a defendant is financially unable to obtain counsel, from finding that funds are available to the defendant nonetheless. In *Jimenez*, our predecessor court merely recognized that after finding a defendant was financially unable to afford counsel, a district court could not, *without more, order as a condition of probation* that the defendant reimburse the government for the cost of his appointed counsel. 600 F.2d at 1174.

decisions made by a federal district court are 'judicial' in nature; some decisions are properly understood to be 'administrative'" and are not subject to review under § 1291. *Id.* (quoting *Hohn v. United States*, 524 U.S. 236, 245 (1998)). We have previously held that because district court orders under § 3006A(f)—whether directing a person to pay money into the court's registry or directing a court clerk to pay money from the registry to cover the cost of appointed counsel—are administrative, not judicial, in nature, we generally lack jurisdiction under § 1291 to review them. *United States v. Griggs*, 240 F.3d 974, 974 (11th Cir. 2001); *see United States v. Owen*, 963 F.3d 1040, 1053 (11th Cir. 2020).

There is one exception to this rule, however. We may review district court orders under § 3006A(f) to ensure that the "district court complied with the procedural requirements of § 3006A." *Owen*, 963 F.3d at 1053 (citing *United States v. Bursey*, 515 F.2d 1228 (5th Cir. 1975)).

With these principles in mind, we examine our jurisdiction to review each of the appellants' four grounds for challenging the district court's orders in this case.[9] Three of these grounds concern the district court's failure to comply with the

---

[9] We raise *sua sponte* the question of whether we have jurisdiction under § 1291 to review the district court's orders. *See Corley v. Long-Lewis, Inc.*, 965 F.3d 1222, 1233 (11th Cir. 2020) ("[L]ongstanding principles of federal law oblige us to inquire *sua sponte* whenever a doubt arises as to the existence of federal jurisdiction." (internal quotation marks omitted)); *Corsello v. Lincare, Inc.*, 276 F.3d 1229, 1230 (11th Cir. 2001) (reflecting that the question of whether a district court order constituted a final decision for purposes of § 1291 is a jurisdictional issue subject to *sua sponte* review).

procedural requirements of § 3006A(f). They include that the district court: lacked the authority to raise *sua sponte* the question of whether a portion of the fees paid to the appellants were available to the defendants for purposes of the CJA, failed to perform an appropriate inquiry into whether the funds were available to the defendants before compelling the payment of funds into the court's registry, and improperly required the appellants to pay funds into the court's registry before any appointed counsel had submitted a payment voucher. We have jurisdiction to review these challenges. *See Owen*, 963 F.3d at 1053–54.

We lack jurisdiction, though, to review the appellants' fourth challenge, that the district court erred in finding that a portion of the funds were available to the defendants. This argument does not fit within the narrow exception that permits us to review a district court's compliance with § 3006A's procedures. *See id.* at 1053. We therefore address it no further.

We now turn to the merits of the challenges over which we have jurisdiction.

**B.**

We begin with the appellants' argument that the district court lacked the authority to raise *sua sponte* the question of whether a portion of the fees paid to the appellants were "available for payment from or on behalf of" the defendants. 18 U.S.C. § 3006A(f). We discern no error.

16

The CJA contemplates a district court's *sua sponte* inquiry into the availability of funds. The statute makes no mention of motions to investigate a defendant's financial status. Instead, the CJA provides that a judge may require partial payment "[i]f *at any time* after the appointment of counsel the . . . court finds that the person is financially able" to pay. 18 U.S.C. § 3006A(c) (emphasis added).

Next, we consider the appellants' argument that the district court failed to perform an appropriate inquiry before ordering them, under the threat of contempt, to pay $15,000 into the court's registry. We find the argument meritless.

To satisfy the procedural requirements of § 3006A(f), a district court must make an "appropriate inquiry" into the availability of funds. *Owen*, 963 F.3d at 1053–54 (internal quotation marks omitted). To perform an appropriate inquiry, the district court must give an interested party "notice and an opportunity to be heard" on the funds-availability issue. *Id.*; *Bursey*, 515 F.2d at 1236. A binding decision from our predecessor court established that a district court must make an appropriate inquiry before directing the clerk to pay funds *from* the court's registry. *Bursey*, 515 F.2d at 1236. But we have not decided whether a district court also must make an appropriate inquiry before directing an interested party to pay money *into* the court's registry. *See Owen*, 963 F.3d at 1054. In *Owen*, we observed that the text of § 3006A(f) "suggests" that a district court must perform

17

an appropriate inquiry before directing money to be paid in the registry. *Id.* But we did not resolve this question in *Owen* because we assumed, without deciding, that such an inquiry was required. *Id.* Following that approach, we again assume, without deciding, that the district court had to perform an appropriate inquiry before directing the appellants, who were interested parties, to pay money into the court's registry.

The district court performed a thoroughly appropriate inquiry before entering its order directing the payment of $15,000 into the court's registry. Within days after the appellants were disqualified, the magistrate judge raised the question of whether the law firm could keep all of fees it had been paid or "whether some portion of the fees . . . should be refunded" to the defendants. Doc. 136 at 14. This put the appellants on notice as of March 26 that the court was considering whether a portion of the fees paid to the law firm belonged instead to the defendants. After identifying this issue, the magistrate judge gave the appellants an opportunity to be heard by directing them to submit, by March 29, an accounting addressing how and by whom the fees had been paid and what services the attorneys had performed to earn the fees before their disqualification. It was only after the appellants ignored the order and refused to provide this information that the magistrate judge, on April 24, directed the appellants to pay $15,000 into the court's registry.

But that is not all.  The appellants were able to seek further review in the district court when they filed objections to the magistrate judge's order.  The district court reviewed their objections, considering whether the magistrate judge's ruling was "contrary to law or clearly erroneous," thus giving them another opportunity to be heard on whether the funds belonged to the law firm.  Fed. R. Crim. P. 59(a); *see* 28 U.S.C. § 636(b)(1)(A).  Because the appellants received sufficient notice and several opportunities to be heard on what portion of the total fees belonged to the law firm versus the defendants before they were to pay money into the court's registry, we conclude that the district court performed an appropriate inquiry that complied with the procedural requirements of § 3006A(f).

Even if we assume that the district court failed to afford the appellants adequate notice and opportunity to be heard before directing them to pay money into the court's registry, we would conclude that any error was harmless because the district court afforded them appropriate process before directing the clerk to pay the money out of the court's registry.  *See Owen*, 963 F.3d at 1054.  When the court entered the order requiring payment into the court's registry, it invited them to present information proving they were entitled to the funds in "escrow."  Doc. 142 at 6.  The appellants then had several more opportunities to be heard on the total fee the law firm had earned before the district court made its final determination that $7,000 of the funds paid to the firm constituted "funds available

19

for payment" from or on behalf of the defendants and directed the money to be paid into the CJA Fund.  Doc. 206 at 6 (citing 18 U.S.C. § 3006A(f)).  And appellants have identified no harm that they suffered because of this timing.

True, the appellants try to attack the timing of the proceedings by saying it was not "until *after* [they] had already been threatened with contempt and forced to surrender the funds that § 3006A(f) was even mentioned as the basis for the lower courts' authority."  Appellants' Br. at 15–16 (emphasis in original).  The record flatly contradicts their assertion, however.  The magistrate judge's order directing the law firm to pay $15,000 into the court's registry, issued on April 24, identified the CJA as a source of the court's authority for its inquiry into whether the funds belonged to the attorneys or the defendants.  *See* Doc. 107 at 2 (stating that "a portion of the fees paid to" the law firm may be "applied to the CJA fund").[10]  And on May 17, when the district court overruled the appellants' objections to this order, it recognized that a finding that a portion of the fees belonged to the defendants would mean that this money constituted funds available to the defendants that could be used to reimburse the fees and expenses of their appointed counsel under the CJA.  *See* Doc. 142 at 4 (citing 18 U.S.C. § 3006A(f)).  It was

---

[10] Significantly, it was on April 23 and April 24 that the magistrate judge entered the orders finding that each defendant was financially unable to employ counsel and appointing counsel under the CJA.  Thus, the magistrate judge invoked the court's authority under the CJA as soon as the statute was implicated by the appointment of CJA counsel.

after these two orders, on May 22, that the show-cause order threatening contempt sanctions was issued. We therefore reject the appellants' procedural argument.

Lastly, we evaluate the appellants' argument that the district court should not have ordered them to pay over any funds until after appointed counsel submitted their CJA payment vouchers. This argument also fails.

The CJA broadly permits a district court or magistrate judge to "authorize or direct" payment of available funds "*[w]henever*" it finds that the funds are available. 18 U.S.C. § 3006A(f) (emphasis added); *see also United States v. Robertson*, 980 F.3d 672, 677 (9th Cir. 2020) ("The plain language of [section 3006A(f)] makes it clear that the district court acted within its discretion when it . . . ordered reimbursement and payment for future defense costs before sentencing." (internal quotation marks omitted)); 7A Guide to Judiciary Policy § 210.40.40 (instructing courts to "direct the person to pay the available excess funds to the clerk of the court at the time of [counsel's] appointment or from time to time after that"). Given this plain language, the district court committed no procedural error based on the timing of its order directing the appellants to pay funds into the court's registry.

### III.    CONCLUSION

We dismiss for lack of jurisdiction the appellants' challenge to the district court's determination that funds were available to the defendants. As to all the appellants' other challenges, we affirm.

**AFFIRMED IN PART, DISMISSED IN PART.**